## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
## LAFAYETTE DIVISION

CHRISTOPHER RAY HARDY            CASE NO.  6:21-CV-03338

VERSUS                          JUDGE ROBERT R. SUMMERHAYS

KILOLO KIJAKAZI                 MAGISTRATE JUDGE CAROL B. WHITEHURST

### REPORT AND RECOMMENDATION

Before the Court is an appeal of the Commissioner's finding of non-disability. Considering the administrative record, the briefs of the parties, and the applicable law, it is recommended that the Commissioner's decision be affirmed.

### Administrative Proceedings

Claimant, Christopher Hardy, fully exhausted his administrative remedies before filing this action in federal court. He filed an application for disability insurance benefits, alleging disability beginning on October 3, 2013. (Rec. Doc. 3-1, p. 159). His application was denied. He then requested a hearing, which was held on February 3, 2020, before Administrative Law Judge Devona Able. (Rec. Doc. 3-1, p. 42 et seq). The ALJ issued a decision on March 11, 2020, concluding that Claimant was not disabled within the meaning of the Social Security Act from the claimed disability onset date through the date of the decision. Claimant requested that the Appeals Council review the ALJ's decision, but the Appeals Council found

no basis for review. (Rec. Doc. 3-1, p. 5). Therefore, the ALJ's decision became the final decision of the Commissioner for the purpose of judicial review. *Higginbotham v. Barnhart*, 405 F.3d 332, 336 (5th Cir. 2005). Claimant then initiated this action, seeking review of the Commissioner's decision.

## Summary of Pertinent Facts

Claimant was born on August 14, 1970. He was 43 years old on the alleged disability onset date and 49 years old at the time of the ALJ's decision. He has a tenth-grade education. He worked in the oilfield from 2006 through 2013 as a driller, rigger, and derrick hand. (Rec. Doc. 3-1, p. 50-55). He was injured on the job in 2013 and eventually settled his workers compensation claim.

The medical records in the record reveal the following pertinent history:

- Claimant was injured on the job in October 2013 when a wrench he was using slipped. (Rec. Doc. 3-1, p. 352).

- A November 1, 2013 cervical MRI revealed fairly advanced degenerative changes in the cervical spine for age, primarily mid to lower aspect with straightening of normal cervical lordosis and slight reversal centered at about C4-5 and mild narrowing of the cervical canal on a congenital basis; mild hyperintense signal demonstrated with the cervical cord at C5-6 and lesser at C6-7, likely related to mild myelomalacia with no associated abnormal enhancement; suspect broad-based left foraminal protrusion at C2-3, at least

abutting existing left C3 nerve root and causing moderate left foraminal stenosis; C3-4 and C4-5 mild to moderate canal and moderate to severe bilateral foraminal stenosis; C5-6 spondylitic bulge-herniation flattening ventral cervical cord with moderate to severe canal and foraminal stenosis; and C6-7 spondylitic bulge-herniation flattening ventral cervical cord with moderate to severe canal and fairly severe bilateral foraminal stenosis. (Rec. Doc. 3-1, p. 244).

- Claimant treated conservatively with medication and physical therapy as prescribed by Dr. Jason Cormier for neck pain and radiculopathy between December 2013 until ultimately undergoing cervical surgery. On April 1, 2014, Dr. Cormier performed a C5-6 anterior cervical discectomy with fusion with instrumentation. The operative report noted that there was a retained metal fragment or foreign body in the way of a distraction screw which broke within the sclerotic bone. Because it was a sterile object, it was decided that the risks outweighed the benefits of going after this small piece of retained fragment which was left intraoperatively. (Rec. Doc. 3-1, p. 251-65).

- In his two-week follow up with Dr. Cormier, Claimant was still having left arm pain and numbness, but said it was improving daily. (Rec. Doc. 3-1, p. 267).

3

- By October 2014 he was still complaining of left palm pain at 9/10 and all fingertips tingling. He was dropping things, and his left hand was much weaker than his right, a fact which was supported by the physical exam. He had a positive spurling's test (right worse than left). His wife stated that he talked about hurting himself. Dr. Cormier's assessment was brachial neuritis or radiculitis due to displacement of cervical intervertebral disc. He referred Claimant to Dr. Wyble for pain management, noting that Claimant was somewhat frustrated with his medical problems, though he had made great strides in his progress. (Rec. Doc. 3-1, p. 287-89).

- Dr. Ricardo Leoni conducted a neurological surgery consult on October 28, 2014. Claimant had experienced a work incident on October 3, 2013, when he was tightening a bolt, the wrench slipped and jerked him. He thereafter experienced severe neck and left arm and hand pain. He had undergone an anterior discectomy and interbody fusion at C5-6 and C6-7 for cervical radiculopathy secondary to disc herniation. He had disc herniations and spinal cord compression. Claimant advised that his symptoms had not improved after the surgery, and he continued with constant pain in his neck and left arm/hand with tingling and numbness. Physical examination revealed no weakness in the lower or upper extremities and a normal gait; however, he had a positive

Hoffman's signs on the left. Dr. Leoni recommended a repeat MRI and opined that his whole body disability would be 20%. (Rec. Doc. 3-1, p. 239-43).

- A repeat cervical MRI in December 2014 revealed fairly advanced degenerative changes within the cervical spine with straightening of normal cervical lordosis and slight reversal and narrowing of the cervical canal on a congenital basis; stable mild hyperintense signal within the lower cervical cord, again likely related to myelomalacia; stable appearing left foraminal broad-based protrusion at C2-3 with moderate left foraminal stenosis; C3-4 and C4-5 demonstrate stable mild to moderate canal and moderate to severe bilateral foraminal stenosis; postsurgical changes at C5-6 and C6-7 with interval improvement and patency of canal and foramina, mild canal and bilateral foraminal stenosis at these levels except for moderate foraminal stenosis on the right at C6-7. (Rec. Doc. 3-1, p. 282).

- Another imaging study in September 2015 showed straightening of the cervical spine, mild C3-4 and C4-5 degenerative changes, and C5, 6, 7 anterior fusion with minimal partial union at C5-6. (Rec. Doc. 3-1, p. 284).

- Claimant treated with Dr. Stephen Wyble for pain management between January 2015 and December 2017. During that time, Dr. Wyble prescribed pain medications, some of which caused skin irritation and GI issues. He also administered two cervical epidural steroid injections. The records indicate

Claimant had situational anxiety due to the inability to work and also depression. (Rec. Doc. 3-1, p. 351-492). Notably, in September 2017, Claimant had failed a urinary drug screen, which showed he tested positive for Roxicodone and Norco, though he did not have a prescription for Norco. (Rec. Doc. 3-1, p. 368). In January 2017, it was noted that his labs suggested the presence of THC. Claimant stated that he was around friends who were smoking it, and he was very upset about this. (Rec. Doc. 3-1, p. 378).

- Claimant returned to Dr. Cormier on October 20, 2016. He indicated that he has had neck pain since the surgery and complained of numbness in his left fingers that radiated to his left shoulder. He described his pain as 9 out of 10 daily. Dr. Cormier had ordered an EMG and bone stimulator for C6-7 pseudoarthrosis. Dr. Cormier restarted Valium and prescribed physical therapy. (Rec. Doc. 3-1, p. 290-91). Claimant thereafter attended physical therapy, but he stated that he did not get the bone stimulator, because Dr. Wyble had advised it would not help him. He was taking pain medications which seemed to help a little, though he continued with neck pain. Dr. Cormier reviewed the cervical CT scan, which looked good but noted mild degenerative changes at the adjacent levels with no surgical pathology noted. Dr. Cormier still recommended the bone stimulator and to continue with physical therapy. (Rec. Doc. 3-1, p. 292; CT scan at p. 295).

- On January 31, 2017, Dr. Patrick Juneau, III, neurosurgeon, examined Claimant for persistent neck and left arm pain and numbness. Claimant advised Dr. Juneau that initially the operation helped reduce his symptoms, though they never fully went away. Twelve months after the operation, his symptoms returned to pre-operative levels. He had somewhat unsteady gait since the accident. Since the April 2014 operation, he had undergone two cervical epidural steroid injections, which had not helped. Ever since the accident, he has had some difficulty with bowel and bladder functions, though no loss of control. Physical examination showed some limited range of motion in the neck, negative Tinel's signs over the carpal and cubital tunnels, and no atrophy or fasiculations in the upper or lower extremities. Dr. Juneau's ultimate impression was that Claimant suffered from myelomalacia or damage within the spinal cord resulting from disc herniations at C5-6 and C6-7, though there was no residual cord compression. He also had diffuse hyperreflexia and ataxia to his gait. Nonetheless, Dr. Juneau did not think any further surgery was necessary, and that Claimant was at maximum medical improvement. He concluded that Claimant should be restricted to sedentary work permanently, that he could occasionally lift objects weighing up to 10 pounds and frequently lift objects weighing no more than light weight. He carried a 20% permanent partial physical impairment rating of the whole body

with the following additional restrictions: should not engage in overhead work or work with arms in an outstretched position, climb ladders, avoid bending and stooping at the waist, crawling, kneeling, and working on vibratory surfaces. (Rec. Doc. 3-1, p. 298-303).

- On March 16, 2017, Dr. Juneau again examined Claimant and noted that he continued with persistent neck and left arm pain. He had an area of myelomalacia within the spinal cord, which caused residual cervical myelopathy. Dr. Juneau stated that patients with this condition fatigue very easily and experience periods of worsening arm and leg weakness and numbness at various intervals daily. He reiterated that Claimant should be restricted to sedentary work on a permanent basis. (Rec. Doc. 3-1, p. 296).

- Most recently, Claimant has treated only with his family doctor, Dr. Metoyer from March through December 2019. Though many of the records are illegible, Dr. Metoyer advised that he continue his present care with medications. (Rec. Doc. 3-1, p. 526-30).

Claimant testified at the hearing that he now sees his family doctor, Dr. Metoyer periodically for medication refills, including oxycodone, a muscle relaxer, and a stomach medicine. He takes oxycodone four times a day but continues to experience pain. He had not seen Dr. Wyble since December 2020, because he had to do a drug screening every visit and they claimed there was something in his system

that he never did. (Rec. Doc. 3-1, p. 56-59). He testified that he can stand/walk for three to four hours and sit for 50 minutes to an hour. (Rec. Doc. 3-1, p. 62). His wife does all of the household chores and drives. He further testified that he is depressed.

The ALJ found that Claimant had the residual functional capacity perform sedentary work subject to several physical restrictions and that a significant number of at least one qualifying job existed in the national economy, such that Claimant was not disabled. Claimant now seeks reversal of the Commissioner's adverse ruling.

## Analysis

### A.    Standard of Review

Judicial review of the Commissioner's denial of disability benefits is limited to determining whether substantial evidence supports the decision and whether the proper legal standards were used in evaluating the evidence. *Villa v. Sullivan*, 895 F.2d 1019, 1021 (5th Cir. 1990); *Martinez v. Chater*, 64 F.3d 172, 173 (5th Cir. 1995). "Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983). Substantial evidence "must do more than create a suspicion of the existence of the fact to be established, but 'no substantial evidence' will only be found when there is a

'conspicuous absence of credible choices' or 'no contrary medical evidence.'" *Id.* (citations omitted).

If the Commissioner's findings are supported by substantial evidence, they are conclusive and must be affirmed. 42 U.S.C. § 405(g); *Martinez v. Chater*, 64 F.3d at 173. A court must carefully examine the entire record but refrain from re-weighing the evidence or substituting its judgment for that of the Commissioner. *Hollis v. Bowen*, 837 F.2d 1378, 1383 (5th Cir. 1988); *Villa v. Sullivan*, 895 F.2d at 1022. Conflicts in the evidence and credibility assessments are for the Commissioner to resolve, not the courts. *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985); *Wren v. Sullivan*, 925 F.2d 123, 126 (5th Cir. 1991). Four elements of proof are weighed by the courts in determining if substantial evidence supports the Commissioner's determination: (1) objective medical facts, (2) diagnoses and opinions of treating and examining physicians, (3) the claimant's subjective evidence of pain and disability, and (4) the claimant's age, education and work experience. *Wren v. Sullivan*, 925 F.2d at 126.

### B.  <u>Entitlement to Benefits</u>

The Disability Insurance Benefit program provides income to individuals who are forced into involuntary, premature retirement, provided they are both insured and disabled, regardless of indigence. *See* 42 U.S.C. § 423(a).  *See also Smith v. Berryhill*, 139 S.Ct. 1865, 1772 (2019). Supplemental Security Income SSI provides

income to individuals who meet certain income and resource requirements, have applied for benefits, and are disabled. 42 U.S.C. § 1382(a)(1) & (2). See also *Smith v. Berryhill*, 139 S.Ct. at 1772. A person is disabled "if he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). A claimant is disabled if his physical or mental impairment or impairments are so severe that he is unable do his previous work and considering his age, education, and work experience, cannot participate in any other kind of substantial gainful work that exists in significant numbers in the national economy, regardless of whether such work exists in the area in which the claimant lives, whether a specific job vacancy exists, or whether the claimant would be hired if he applied for work. 42 U.S.C. § 1382c(a)(3)(B).

## C.    **Evaluation Process and Burden of Proof**

A sequential five-step inquiry is used to determine whether a claimant is disabled. The Commissioner must determine whether the claimant (1) is currently working; (2) has a severe impairment; (3) has an impairment listed in or medically equivalent to those in 20 C.F.R. Part 404, Subpart P, Appendix 1; (4) is able to do the kind of work he did in the past; and (5) can perform any other work. 20 C.F.R. § 404.1520.

11

Before going from step three to step four, the Commissioner evaluates the claimant's residual functional capacity by determining the most the claimant can still do despite his physical and mental limitations based on all relevant evidence in the record. 20 C.F.R. § 404.1520(a)(4); 20 C.F.R. § 404.1545(a)(1). The claimant's residual functional capacity is used at the fourth step to determine if he can still do his past relevant work and at the fifth step to determine whether he can adjust to any other type of work. 20 C.F.R. § 404.1520(e).

The claimant bears the burden of proof on the first four steps; at the fifth step, however, the Commissioner bears the burden of showing that the claimant can perform other substantial work in the national economy. *Graves v. Colvin*, 837 F.3d 589, 592 (5th Cir. 2016); *Bowling v. Shalala*, 36 F.3d 431, 435 (5th Cir. 1994). This burden may be satisfied by reference to the Medical-Vocational Guidelines of the regulations, by expert vocational testimony, or by other similar evidence. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987). If the Commissioner makes the necessary showing at step five, the burden shifts back to the claimant to rebut this finding. *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005); *Fraga v. Bowen*, 810 F.2d at 1302. If the Commissioner determines that the claimant is disabled or not disabled at any step, the analysis ends. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994), cert. den. 914 U.S. 1120 (1995) (quoting *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987)).

## D.    The ALJ's Findings and Conclusions

The ALJ determined at step one that Claimant has not engaged in substantial gainful activity since October 3, 2013. (Rec. Doc. 3-1, p. 30). This finding is supported by substantial evidence in the record.

At step two, the ALJ found that Claimant has the following severe impairments: degenerative disc disease of the cervical spine and chronic pain syndrome. (Rec. Doc. 3-1, p. 31). Claimant challenges this finding.

At step three, the ALJ found that Claimant has no impairment or combination of impairments that meets or medically equals the severity of a listed impairment. (Rec. Doc. 3-1, p. 31). Claimant challenges this finding.

In determining Claimant residual functional capacity (RFC), the ALJ found that Claimant could perform sedentary work, subject to several physical restrictions. (Rec. Doc. 3-1, p. 32-35).  Claimant does not specifically challenge this finding, but rather broadly challenges the ALJ's decision as unsupported by substantial evidence.

At step four, the ALJ found Claimant was unable to perform any past relevant work. (Rec. Doc. 3-1, p. 35). Claimant does not challenge this finding.

At step five, the ALJ found Claimant was capable of performing a significant number of jobs available in the national economy. Claimant challenges this finding.

## E.    The Allegations of Error

Claimant alleges the ALJ erred as follows:

1. The ALJ erred in finding that Claimant's physical impairments were limited to degenerative disc disease of the cervical spine and chronic pain syndrome.

2. The ALJ erred in finding that Claimant's combination of impairments was not medically equivalent to one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

3. The ALJ erred in finding that there were jobs that existed in significant numbers in the national economy that Claimant could have performed.

4. The ALJ's decision is not supported by substantial evidence in that the ALJ failed to consider the record as a whole regarding cervical spine, mental and other impairments.

The Court shall consider the last alleged error as a challenge to the ALJ's RFC finding.

**F.**    **Whether the ALJ properly determined Claimant's physical impairments.**

The ALJ found Claimant suffered degenerative disc disease of the cervical spine and chronic pain syndrome, which were severe impairments. The ALJ also considered Claimant's mental functioning, noting that, although the records show depression and a psychological referral, Claimant had not treated for any mental issues, and his depression did not appear to affect his functional ability. (Rec. Doc. 3-1, p. 31). Claimant argues that the ALJ should also have found foraminal stenosis,

radiculomyelopathy, and myelomalacia, all in the cervical spine, also as severe physical impairments.

To evaluate whether a claimant's medical condition qualifies as a "severe impairment" at Step Two of the analysis, the Commissioner has issued regulations that define a "severe impairment" as one that "significantly limits [a claimant's] physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.1520(c), 416.920(c), 404.1521 ("An impairment or combination of impairments is not severe if it does not significantly limit your physical or mental ability to do basic work activities."). The Fifth Circuit, however, has held that a literal application of that definition is inconsistent with the statutory language and legislative history of the Social Security Act. *Stone v. Heckler*, 752 F.2d 1099, 1104–05 (5th Cir. 1985). Therefore, in *Stone v. Heckler*, the Fifth Circuit established the following standard for determining whether a claimant's impairment is severe: an impairment is not severe only when it is a "slight abnormality" having "such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education[,] or work experience." *Id.* at 1101.

The Court agrees that the medical records support that Claimant suffered from cervical foraminal stenosis, radiculomyelopathy, and myelomalacia. (See e.g. Rec. Doc. 3-1, p. 244; 282; 298-303). It is unclear to the Court (who is not a doctor) whether the additional severe impairments urged by Claimant are subsumed by the

diagnoses of degenerative disc disease and chronic pain syndrome, and Claimant has not explained how these additionally identified severe impairments affect the ALJ's conclusions in the following steps of the analysis. Therefore, the Court declines to rule in favor of Claimant on this assigned error.

### G.    Whether the ALJ properly found Claimant's impairments were not listed impairments.

Claimant next argues the ALJ erred in failing to find that Claimant's impairments were not medically equivalent to a listed impairment.

> If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be disabled. If the impairment is not one that is conclusively presumed to be disabling, the evaluation proceeds to the fourth step...." *Yuckert,* 482 U.S. at 141–42, 107 S.Ct. 2287 (citing 20 C.F.R. §§ 404.1520(e), 416.920(e)).

*Loza v. Apfel*, 219 F.3d 378, 390 (5th Cir. 2000).

The Court reiterates that Claimant bears the burden of proof to show that his impairment meets or is medically equivalent to a listed impairment. See *Graves v. Colvin*, 837 F.3d at 592. Although Claimant cited various medical records regarding his diagnoses and treatment, he did not cite any specific applicable listing or explain how his impairments are medically equivalent to a listed impairment. But the ALJ's discussion was no better. The ALJ concluded that none of Claimant's impairments meet or equal a listing.  Although he broadly identified Section 1.00 Musculoskeletel System, *et seq* as an applicable listing, he reached this conclusion without any

16

comparison of Claimant's symptoms or clinical findings with the criteria of any specific listing.  (Rec. Doc. 3-1, p. 32). This is insufficient.

An "ALJ is required to discuss the evidence and explain the basis for his findings at each unfavorable step of the sequential evaluation process." *Williams v. Astrue*, No. 09-0130, 2010 WL 989216, at * 3 (W.D. La. Mar. 15, 2010), citing *Audler v. Astrue*, 501 F.3d 446, 448 (5th Cir. 2007), which in turn cites 42 U.S.C. § 405(b)(1).  In *Audler v. Astrue*, the ALJ, at step three of the analysis:

> summarily concluded that "[t]he medical evidence indicates that the claimant has status post lumbar laminectomy, cervical disc herniation, headaches and chronic neck and back pain, impairments that are severe within the meaning of the Regulations but not severe enough to meet or medically equal one of the impairments listed in Appendix 1, Subpart P, Regulations No. 4."  The ALJ did not identify the listed impairment for which Audler's symptoms fail to qualify, nor did she provide any explanation as to how she reached the conclusion that Audler's symptoms are insufficiently severe to meet any listed impairment.

> *Audler v. Astrue*, 501 F.3d at 448.

The Fifth Circuit concluded that "[s]uch a bare conclusion is beyond meaningful judicial review." *Id*. quoting *Clifton v. Chater*, 79 F.3d 1007, 1009 (10th Cir. 1996). The court further explained that:

> By the explicit terms of the statute [42 U.S.C. § 405(b)(1)], the ALJ was required to discuss the evidence offered in support of Audler's claim for disability and to explain why she found Audler not to be disabled at that step.  Although the ALJ is not always required to do an

exhaustive point-by-point discussion, in this case, the ALJ offered nothing to support her conclusion at this step and because she did not, "we, as a reviewing court, simply cannot tell whether her decision is based on substantial evidence or not."

*Id.*, quoting *Cook v. Heckler*, 783 F.2d 1168, 1172 (4th Cir. 1986).

Despite Claimant's failure to adequately brief his challenge, the Court agrees that the ALJ failed to comply with his duty. In this case, the ALJ broadly stated that the claimant failed to meet his burden proof, without citing any record evidence. Rather, he relied exclusively on the statement of the state agency medical consultant who found that Claimant did not have a listed or medically equivalent impairment. He abdicated his responsibility and avoided the necessary evaluation by deferring to others. If the conclusions of the initial examiners were controlling, there would be no need for the ALJ. Thus, the Court finds that the ALJ erred at step 3; however, the Court must determine whether the error is harmless. *Audler* 501 F.3d at 448.

Although the ALJ broadly found without explanation that Claimant's impairment did not qualify as listed, the ALJ fully considered the medical evidence in support of his conclusion that Claimant was capable of performing sedentary work with certain physical restrictions. (Rec. Doc. 3-1, p. 32-35). The records do not indicate that Claimant suffered the required loss of function for a musculoskeletal impairment. Claimant was required to show either an "inability to ambulate effectively on a sustained basis ..., or the inability to perform fine and gross

movements effectively on a sustained basis." 20 C.F.R. Part 404, Subpt. P, App. 1, § 1.00(B)(2). Claimant testified that he can stand or walk for three to four hours. (Rec. Doc. 3-1, p. 62). Further, Dr. Juneau opined that he could perform sedentary work with restrictions related to use of arms, bending, stopping, crawling, and kneeling. Dr. Juneau did not indicate any significant restrictions for walking or performing fine and gross movements. Therefore, the Court finds that the ALJ's error in failing to adequately analyze whether Claimant satisfied a listing requirement was harmless.

**H.    <u>Whether the ALJ's RFC finding is supported by substantial evidence based on the record as a whole.</u>**

Claimant next challenges the ALJ's decision as failing to consider the record as a whole. Here, Claimant appears to challenge the ALJ's RFC finding. He argues that the ALJ failed to consider that he treated with Dr. Wyble for pain management during 2015 through 2017, that he has since treated with his family doctor, and that objective medical evidence shows that he suffers from cervical radiculopmyelopathy, myelomalacia at C6, depression, anxiety, and insomnia. However, the Court finds that the ALJ's RFC finding was based on substantial evidence in the record and that the ALJ properly assessed Claimant's RFC as sedentary with restrictions for balancing, stooping, kneeling, crouching, crawling, climbing, performing overhead work or work with arms in the outstretched position.

Dr. Juneau, Claimant's treating physician upon which the ALJ principally relied in assessing the RFC, opined that Claimant could perform sedentary work with these restrictions. (Rec. Doc. 3-1, p. 296-303). Nothing in the voluminous records outlined above suggests Claimant was incapable of sedentary work with these restrictions. Further the ALJ also considered records evidencing Claimant's pain management treatment with Dr. Wyble and his surgical, medication, and treatment history. (Rec. Doc. 3-1, p. 32-35, referencing p. 239-44; 255-67; 287-89; 296-303; 351-492). No record evidence conflicts with the ALJ's finding. Hence, the Court finds that the ALJ properly relied on the record as a whole and assessed a proper RFC.

I.   **Whether the ALJ properly determined a significant number of qualifying jobs existed in the national economy.**

Claimant last challenges the ALJ's finding that a significant number of jobs which he could perform existed in the national economy.

A vocational expert is called to testify because of his familiarity with job requirements and working conditions. *Fields v. Bowen,* 805 F.2d 1168, 1170 (5th Cir.1986). "The value of a vocational expert is that he is familiar with the specific requirements of a particular occupation, including working conditions and the attributes and skills needed." *Id.*

*Vaughan v. Shalala*, 58 F.3d 129, 132 (5th Cir. 1995).

The ALJ elicited testimony from vocational expert, Lionel Bordelon, regarding available jobs an individual with Claimant's restrictions could perform.

20

The ALJ posed several hypotheticals, only some of which are relevant here. The ALJ's second hypothetical referenced an individual who is limited to sedentary work who can occasionally balance, stoop, kneel, crouch, crawl and climb ramps and stairs and never climb ladders, ropes, or scaffolds. Mr. Bordelon testified that such an individual could perform the jobs of call-out operator, alarm monitor, and addresser, each of which existed in significant numbers of the national economy. (Rec. Doc. 3-1, p. 71-72). When asked to assume an individual limited with sedentary work with additional restrictions for no overhead work, no prolonged work with arms held in an outstretched position, no crawling, kneeling or working around vibration, Mr. Bordelon testified that such an individual could perform the jobs of call-out operator and alarm monitor with a headset as an accommodation. However, Mr. Bordelon testified that the necessary accommodation would eliminate about 50 percent of available jobs. Such an individual would also be able to perform the job of addresser, which would not require an accommodation. (Rec. Doc. 3-1, p. 72-73). The ALJ ultimately found that Claimant qualified for the addresser job and rejected the possibility of the call-out operator and alarm monitor which would require accommodations. (Rec. Doc. 3-1, p. 36).

The ALJ's last hypothetical assumed an individual limited to sedentary work with the same restrictions as the individual in the preceding hypothetical, but with the additional limitation that the individual would need two extra breaks of at least

fifteen minutes or who would be absent at least two days per month or would be off task at least 20 percent of the day. In that case, Mr. Bordelon testified that no jobs would be available to accommodate such an individual. (Rec. Doc. 3-1, p. 73).

Claimant argues that the ALJ's fourth hypothetical more accurately depicted Claimant's inability to work, such that the ALJ erred by relying on the second hypothetical. Claimant relies on the medical records and his testimony that he frequently tires and requires naps. However, the Court finds that the ALJ's decision is based on substantial evidence. Claimant testified that he can stand/walk for three to four hours before having to sit down. (Rec. Doc. 3-1, p. 62). Although Claimant testified to not sleeping well and taking naps during the day, Claimant offered no testimony or medical evidence that he would need two extra breaks of fifteen minutes, that he would be off work for at least two days during a month, or that he would be off task for at least 20 percent of the day. Accordingly, the Court finds this allegation of error is without merit.

## <u>Conclusion and Recommendation</u>

For the foregoing reasons, this Court recommends that the Commissioner's decision be AFFIRMED.

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Rule Fed. R. Civ. P. 72(b), parties aggrieved by this recommendation have fourteen days from receipt of this report and recommendation to file specific, written objections with the Clerk of

Court.  A party may respond to another party's objections within fourteen days after receipt of a copy of any objections or responses to the district judge at the time of filing.

Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in the report and recommendation within fourteen days following the date of receipt, or within the time frame authorized by Fed. R. Civ. P. 6(b) shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the district court, except upon grounds of plain error.[1]

Signed in Lafayette, Louisiana, this 28th day of April, 2022.

_____
CAROL B. WHITEHURST
UNITED STATES MAGISTRATE JUDGE

---

[1]     See *Douglass v. United Services Automobile Association*, 79 F.3d 1415 (5th Cir. 1996) (en banc), superseded by statute on other grounds, 28 U.S.C. § 636(b)(1).